IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


CARMEN CASSANDRA HAWTHORNE,

      Plaintiff,

v.                                                                                                                    CV 13-1030 WPL

CAROLYN W. COLVIN, *Acting Commissioner of the Social Security Administration*,

      Defendant.


**MEMORANDUM OPINION AND ORDER**

Carmen Hawthorne applied for disability insurance benefits and supplemental security income on August 20, 2008, based on depression and manic episodes. (Administrative Record ("AR") 118-129, 147.) After her applications were denied at all administrative levels, she brought this proceeding for judicial review. The case is before me now on Hawthorne's Motion to Reverse and Remand to Agency for Rehearing, a response filed by the Commissioner of the Social Security Administration ("SSA"), and Hawthorne's reply. (Docs. 21-23.) For the reasons explained below, I grant Hawthorne's motion and remand this case to the SSA for proceedings consistent with this opinion.

**STANDARD OF REVIEW**

When the Appeals Council denies a claimant's request for review, the Administrative Law Judge's ("ALJ") decision is the SSA's final decision. In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir.

2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520, 416.920. If a finding of disability or nondisability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the claimant must show (1) that she is not performing a substantial gainful activity; (2) that she has an impairment severe enough to significantly limit her ability to do basic work activities; and (3) that her impairment or impairments, individually or in the aggregate, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

If the claimant does not satisfy the third prong, the ALJ must determine the claimant's residual functional capacity ("RFC"), or the most that she is able to do despite her limitations. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). An RFC assessment requires two steps: first,

determining whether there is an underlying medically determinable physical or mental impairment or impairments that could reasonably be expected to produce the pain or symptoms; and second, evaluating the intensity, persistence, and limiting effects of all medically determinable impairments to determine the extent to which they limit the claimant's functioning. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013). In cases where symptoms such as pain are alleged, the RFC determination must be supported by a thorough discussion and analysis of the objective medical evidence and other evidence, including the individual's complaints; resolve any inconsistencies in the evidence as a whole; and set forth a logical explanation of the effects of the symptoms on the individual's ability to work. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).[1] Credibility determinations on a claimant's report of symptoms must contain specific reasons for the finding on credibility and be sufficiently specific to make clear to the individual or subsequent reviewers what weight the ALJ gave to the individual's statements and the reasons for that weight. SSR 96-7p, 1996 WL 374186, at *4-5.

At step four, the claimant must prove that, based on her RFC, she is unable to perform the work she has done in the past. *See Thomas*, 540 U.S. at 25; 20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv). At the fifth step, the burden shifts to the Commissioner to show that the claimant is capable, based on her vocational factors, of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25.

---

[1] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

**FACTUAL BACKGROUND**

Hawthorne is a twenty-nine-year-old woman with the equivalent of a high school education and some college coursework. (AR 287.) She worked as a security guard from 2006 until 2008, when she quit because she was pregnant, and has since done short-term work as a cell phone sales clerk, a census collector, and a housecleaner at the state fair. (AR 191.) Hawthorne claims disability beginning on August 1, 2008, based on depression and manic episodes. (AR 147.)

Hawthorne has an extensive medical record, including both physical and psychological ailments. Her earliest submitted documents come from the Southwest Counseling Center ("SWCC"), dated January 2005. (AR 263.) Hawthorne was referred to SWCC for counseling for depression by the New Mexico Children, Youth, and Families Department ("CYFD"), after CYFD took custody of her daughter in August 2004. (AR 264.) Hawthorne reported that she felt "stressed out, tearful, and sad since her daughter was placed in foster care. . . ." (*Id.*) She further indicated that she had a history of suicide attempts, including one in 2000 for which she was admitted to the Mesilla Valley Hospital, a mental health institution. (AR 266.) Her initial suicidality stemmed from living in the foster system and a history of abuse and neglect. (*Id.*)

SWCC assessed Hawthorne with moderately severe somatic concerns, very mild anxiety, mild depression, mild guilt, moderate hostility, mild self-neglect, mild tension, and moderately severe distractibility in January 2005. (AR 277.) Hawthorne self-reported that, in the week leading up to her appointment, she had been "a little bit" bothered by feelings of restlessness, feelings of worthlessness, and feeling blue; moderately bothered by feeling tense or "keyed up"; and quite a bit bothered by feeling lonely even when with people, feeling no interest in things, and feeling afraid in open spaces or on the streets. (AR 282.) She was diagnosed with

"Adjustment Disorder with Mixed Anxiety and Disturbance of Emotions" (AR 284), as well as depression and post-traumatic stress (AR 258).

Hawthorne reported that, sometime between January 2005 and January 2006, she was incarcerated due to charges filed by CYFD. She was released in February 2006. (AR 238, 245, 251.) She re-contacted SWCC in April 2006, reporting current domestic violence issues and anxiety attacks. (AR 238.) SWCC created a new treatment plan in April 2006, listing Hawthorne's problems as 1) depression, 2) anxiety, and 3) inadequate housing or living situation. (AR 234.) Hawthorne's intake forms indicate that she exhibited impaired concentration, limited insight, limited judgment, and suicidal ideation with a plan. (AR 239.) Robin McClain, a staff member at SWCC, evaluated Hawthorne at this visit, and noted that she exhibited very mild distractibility; mild guilt, hostility, and self-neglect; moderately severe tension; and severe somatic concerns, anxiety, depression, and emotional withdrawal. (AR 243.) McClain assessed a GAF of 53.[2]

Hawthorne checked in to the Mesilla Valley Hospital on May 21, 2006. (AR 203.) She called the Southwest crisis line after overdosing on "60 pills of a mixture of Zoloft, Paxil, and Valium," and was subsequently referred to the emergency room and admitted based on suicidal actions. (AR 204.) On the day of her admission, attending physician Georgina Herrera, M.D., diagnosed Hawthorne with major depression, recurrent and severe, with suicidal ideation. (AR

---

[2] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). A score between fifty-one and sixty is assessed when the patient is believed to have "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." *Id.* Although the fifth edition of the *DSM* dropped the GAF rating in 2013 in favor of an alternative assessment schedule, Hawthorne's mental health providers used this scoring method.

5

209.) Dr. Herrera assessed Hawthorne a GAF of 28.[3] (*Id.*) Upon discharge, Dr. Herrera found Hawthorne's major depression to be in partial remission and assessed her with a GAF of 50.[4] (AR 204.) MVH released Hawthorne on May 31, 2006, to the Transitional Living Center in Las Cruces. (*Id.*)

Hawthorne returned to SWCC on June 28, 2006. She was evaluated by Karen Lee, CNS, and assessed with major depression, generalized anxiety disorder, post-traumatic stress disorder, personality disorder, borderline personality traits, and a GAF of 45. (AR 227.) She was discharged from SWCC on August 23, 2006, after she failed to respond to outreach or the treatment plan. (AR 212.)

In September 2007, Hawthorne visited the University of New Mexico Hospital ("UNMH") for a case of aseptic viral meningitis. (AR 322-34.) In 2008, she visited First Nations Community Health Source ("First Nations"), under the supervision of Alexandra Kazaras, M.D., for assorted physical complications from a pregnancy with twins. (AR 290-320.) Hawthorne also received prenatal care at UNMH during this period. (AR 321-372.) Hawthorne gave birth to twins at UNMH on November 8, 2008. (AR 365-67.)

On October 11, 2008, David LaCourt, Ph.D., performed a consultative psychological evaluation. Dr. LaCourt found Hawthorne to be appropriately attired, oriented and alert, and with normal attention. (AR 287-89.) Hawthorne was "pleasant and cooperative," with labile affect. (AR 288.) She became "tearful several times as she related her personal history, although she was able to recover and continue." (*Id.*) She reported feeling depressed most of the time,

---

[3] A score between twenty-one and thirty is assessed when the patient's behavior is believed to be "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas . . . ." *Id.*

[4] A score between forty-one and fifty is assessed when the patient is believed to have "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." *Id.*

spending most of a typical day either asleep or in bed. (*Id.*) Hawthorne was able to go out of the house and do basic grocery shopping, but characterized her overall energy as "low." (*Id.*)

Dr. LaCourt assessed Hawthorne with major depressive disorder, recurrent and severe, without psychotic symptoms. He determined that Hawthorne experienced mild limitations understanding and remembering detailed or complex instructions, engaging in public social interactions, adapting to changes in the workplace, and using public transportation or traveling to unfamiliar places; and marked limitations sustaining concentration and task persistence, working without supervision (associated with "frequent rest periods and slowed work performance"), interacting with coworkers, and interacting with supervisors. (AR 288-89.)

On July 21, 2009, Hawthorne went to the University of New Mexico Psychiatric Center for an evaluation. (AR 488.) Brooke Parish, M.D., performed a Behavioral Health Adult Assessment. Hawthorne indicated that she carried past diagnoses of post-traumatic stress disorder, borderline personality disorder, attention deficit disorder, and oppositional defiant disorder. (*Id.*) Hawthorne reported experiencing symptoms of depression two days a week, but her sleep was normal and her energy and appetite levels were good. (*Id.*) She was reassessed with depression and a GAF of 60. (AR 489.)

Donald Gucker, Ph.D., evaluated Hawthorne's application and file on September 30, 2009. (AR 519.) Dr. Gucker concluded that an RFC assessment would be necessary due to Hawthorne's recurrent and moderate major depressive disorder. (AR 519, 522.) Dr. Gucker noted mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (AR 529.) Dr. Gucker highlighted Hawthorne's continued reports of feeling bothered by depression

and suicidal ideation. (AR 531.) He assessed her file as indicating recurrent and moderate major depressive disorder. (*Id.*)

Hawthorne went for a consultative psychological examination with Mark Simpson, PsyD, MAC, LADAC, on July 14, 2010. (AR 463.) She was living in Safe House, a temporary domestic violence shelter, and reported interpersonal issues with her boyfriend. (*Id.*) She also stated that she may return to living with her boyfriend. (*Id.*) Dr. Simpson noted that Hawthorne did not wear makeup and her hair appeared "unkempt," but she was on time, appropriately attired, and cooperative. (*Id.*) Hawthorne explained her reasons for applying for disability benefits as two-fold: first, so that she could "have a second income . . . [and] go back to school;" and second, because she is bothered by depression, with symptoms including little energy, significant weight gain, and frequent crying. (*Id.*) Hawthorne expressed continued suicidal ideation, as recently as the day before her visit. (AR 464.) She further asserted protective factors, including the fact that "too many people depend on her." (*Id.*)

Dr. Simpson assessed Hawthorne with major depressive disorder, moderate and recurrent, and a GAF of 50. (AR 465.) Her condition was not expected to change over the next twelve months. Dr. Simpson assessed Hawthorn with mild limitations in her ability to understand and remember very short and simple instructions; mild-to-moderate limitations in her ability to interact with the public, her ability to interact with coworkers, her ability to interact with supervisors, and her ability to adapt to changes in the workplace; moderate limitations in her ability to understand and remember detailed or complex instructions, her ability to work without supervision, and her ability to use public transportation (with a specific limitation against the use of buses); and moderate-to-marked limitations in her ability to carry out instructions, and her ability to attend and concentrate. (AR 465-66.)

Dr. Gucker subsequently conducted a Mental RFC Assessment for Hawthorne on August 19, 2010. (AR 515-17.) Dr. Gucker noted moderate limitations with regard to Hawthorne's ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule and maintain regular, punctual attendance; ability to sustain an ordinary routine without special supervision; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; ability to respond appropriately to changes in the work setting; ability to travel in unfamiliar places or use public transportation; and ability to set realistic goals or make plans independently of others. (AR 515-16.) Dr. Gucker concluded that Hawthorne had moved from severe depression to moderate depression and that her overall functionality appeared moderately limited. (AR 517.)

In April 2011, Hawthorne returned to First Nations under the care of Dr. Kazaras, and was assessed with depression and physical symptoms. (AR 565.) Hawthorne was eventually prescribed antidepressants. (AR 564.) By January 21, 2012, Hawthorne was taking 60 mg of fluoxetine and was prescribed hydroxyzine for depression. (AR 561.) She reported feeling better with the fluoxetine, but still had days where she felt very sick and down, slept poorly, and overall felt tired with low energy. (*Id.*)

**HEARING TESTIMONY**

The ALJ held a hearing on March 15, 2012, at which Hawthorne and a vocational expert ("VE") testified. (AR 28-60.) She was represented by an attorney. (AR 30.) As a preliminary matter, the ALJ clarified that Hawthorne's date last insured was March 2012. (*Id.*)

Hawthorne testified that she worked after her alleged onset date of August 1, 2008. (AR 31.) She stopped working full-time in 2008 when she was pregnant with twins, now aged three. (AR 35.) She sold cell phones for three months in 2010 or 2011. (AR 31.) She went door-to-door for two weeks for the Census in 2010. (AR 32.) Hawthorne also cleaned bathrooms at the state fair, on a temporary basis, in 2010. (*Id.*) Hawthorne testified that she cries a lot, which prevents her from working. (AR 33.) She sometimes does not want to get out of bed and will remain in her bedroom for days. (*Id.*) Hawthorne stated that she does not have a driver's license and has difficulty getting around because she becomes nauseated when riding the bus. (*Id.*) She has been in several car accidents, and her license is suspended until she either pays the fees or the requisite term of years passes. (AR 36.)

Hawthorne and her husband attended classes at Central New Mexico Community College in 2011. (*Id.*) She attended school for social work, and would like to complete that course. (AR 37.) However, Hawthorne testified that when she enrolled in classes without her husband, she did not do well because she was anxious, crying, could not remember the material, and could not focus in class. (AR 37-38.) The college gave her special accommodations, including extended time for examinations and a recorder in class. (AR 38.)

Hawthorne began taking Prozac in October 2011. (AR 33.) She was prescribed antidepressants previously, but failed to take them. (*Id.*) She experiences side effects including a

hand twitch, excessive sweating, and an upset stomach. (AR 34.) Hawthorne was psychiatrically hospitalized in 2006. (*Id.*)

Hawthorne testified that she sometimes goes grocery shopping, does not often do the laundry, and cooks maybe twice a week. (AR 36.) When she does not perform these tasks, her husband or their fourteen-year-old son, David, does them. (*Id.*) Her husband and church members help with taking care of the children. (AR 54.) Hawthorne frequently sends her children to her mother-in-law's home. (*Id.*)

She likes to crochet and goes to church, but does not often stay for the full three hours. (AR 39-40.) Hawthorne has a Facebook account that she checks daily, except when she is not feeling well. (AR 42.) When she does not feel well, she does not do anything. (AR 48.) She stays home approximately six days per week. (*Id.*) The family has extra house and vehicle keys in case she loses them. (AR 43.)

After examining Hawthorne, the ALJ and Hawthorne's attorney questioned the VE. (AR 55.)

The VE testified that some of Hawthorne's past work experience qualified as a lab technician, classified as light, semi-skilled work. (AR 56.) Hawthorne performed that work, however, in a sedentary manner because she sat most of the day. (*Id.*) She also did construction cleanup, which is classified as medium, unskilled work. (AR 57.) Her cell phone sales are classified as light, semi-skilled work. (*Id.*) Hawthorne's work as a security guard qualifies as light, semi-skilled work. (*Id.*) Her work as a housekeeper at the state fair qualifies as light, unskilled work. (*Id.*)

The ALJ asked whether a person of Hawthorne's age, education, and work history could perform past relevant work if subject to the following limitations: no physical limitations; only

11

simple, routine tasks with short, basic instructions; no interaction with the public and only infrequent and minimal interactions with coworkers. (*Id.*) The VE testified that such a person could perform only the construction cleanup job, and that 461,000 such jobs exist in the national economy and 260 in New Mexico. (AR 57-58.) Furthermore, such a person could perform the jobs of hand polisher and industrial cleaner. (AR 58.)

Hawthorne's attorney then asked the VE whether such a person could find a job in New Mexico, if that individual was limited to being able to concentrate for less than two hours at a time. The VE testified that, with the additional limitation of minimal concentration, such a person would not be able to find a job in the national economy or in New Mexico. (AR 59.)

## THE ALJ AND APPEALS COUNCIL'S DECISIONS

As an initial matter, the ALJ stated that Hawthorne met the insured status requirements through September 2011, contrary to and notwithstanding the conversation at the hearing in March 2012. (AR 15.) There is no explanation for this variance.

The ALJ reviewed Hawthorne's application for benefits according to the sequential evaluation process. (AR 14-15.) At the first step, the ALJ found that Hawthorne had not engaged in substantial gainful activity since the alleged onset date of August 1, 2008. (AR 15.) At the second step, the ALJ concluded that Hawthorne suffers from the severe impairment of major depression. (*Id.*). Then, at step three, the ALJ found that Hawthorne did not have an impairment or combination of impairments equaling the severity of one of the listed impairment. (AR 16.)

As part of step four, the ALJ then determined that Hawthorne has the RFC to perform a full range of work with no exertional limitations. (AR 17.) The ALJ found that Hawthorne has the RFC to perform simple, repetitive tasks and maintain sufficient concentration to persist at those tasks; to understand, remember, and carry out basic instructions; and to have infrequent,

superficial interactions with coworkers, but no interaction with the general public. (*Id.*) The ALJ noted the two-step process for assessing a claimant's symptoms: 1) determining whether there is an underlying, medically determinable, physical or mental impairment that could reasonably be expected to produce the symptoms; and 2) evaluating the intensity, persistence, and limiting effects of the symptoms to determine their impact on the claimant's RFC. (*Id.*)

In making this finding, the ALJ acknowledged Hawthorne's testimony at the hearing. (*Id.*) She then found that Hawthorne's statements concerning intensity and persistence of the symptoms were not credible to the extent they were inconsistent with the RFC. (AR 18.) The ALJ reviewed medical evidence from Dr. LaCourt, Dr. Simpson, First Nations Behavioral Health, and Dr. Gucker. (*Id.*) She found that Hawthorne continues to experience symptoms of depression, but that her symptoms improve with medication and that Hawthorne is not receiving regular counseling or psychiatric treatment. (AR 18-19.) The ALJ further noted that "no treating physician has offered the opinion that [Hawthorne] is disabled[,]" and accorded "[s]ignificant weight" to the State Agency medical consultant's opinion. (AR 19.)

The ALJ concluded that Hawthorne could perform past relevant work as a construction clean-up worker, which is medium exertional level, unskilled work, and does not require her to perform work-related activities precluded by her RFC. (*Id.*) Based on Hawthorne's RFC, she is able to perform the job as it is generally performed. (*Id.*) Relying on the testimony of the VE, the ALJ made alternative findings for step five that Hawthorne could work as a hand polisher or industrial cleaner, and that these jobs exist in significant numbers in the national and regional economies. (*Id.*) Based on her findings at step four and alternative findings for step five, the ALJ concluded that Hawthorne is not disabled and is not eligible for benefits. (AR 20-21.) Hawthorne appealed the decision to the Appeals Council, but the Council found that Hawthorne's reasons

for disagreeing with the outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the SSA. (AR 1-5.)

## DISCUSSION

Hawthorne argues that she has been disabled since August 1, 2008. She makes three broad arguments in favor of reversal and remand. First, Hawthorne argues that the ALJ erred in conducting her RFC assessment by not giving sufficient weight to medical opinion evidence and failing to explain why she did or did not give weight to such opinions. Second, Hawthorne argues that the ALJ erred in conducting her RFC assessment by discrediting Hawthorne's subjective complaints. Finally, Hawthorne argues that the ALJ erred at steps four and five by finding that she could perform past relevant work as a construction clean-up worker or do alternative work that exists in significant numbers in the national and regional economies. Because I find that the ALJ erred in considering the medical evidence, I do not reach the remaining issues raised by Hawthorne because they may be affected by the ALJ's treatment of this case on remand.

Hawthorne challenges the ALJ's use of medical opinion evidence in several ways. First, Hawthorne alleges that the ALJ failed to explain how the opinions of Dr. LaCourt and Dr. Simpson were weighed, particularly as the ALJ appears to have accepted and rejected portions of each opinion. Second, Hawthorne contends that the ALJ gave inappropriate weight to the non-examining consultant, Dr. Gucker. Third, she argues that it is impermissible practice to consider whether antidepressants are prescribed by a treating physician or a treating psychiatrist. Fourth, Hawthorne argues that the ALJ improperly noted that "no treating physician has offered the opinion that the claimant is disabled." Finally, Hawthorne makes a cumulative argument that the ALJ engaged in impermissible picking-and-choosing among the evidence to support her RFC

without regard to contrary facts. Because I agree that the ALJ failed to explain her use of certain medical opinions, and that an appropriate explanation may resolve the other issues, I reach only Hawthorne's first and second claims of error in this regard.

The ALJ must consider all medical opinions in the record. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Quintero v. Colvin*, 567 F. App'x. 616, 619 (10th Cir. 2014) (unpublished). Further, the ALJ must explain the weight assigned to these opinions. *See* 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii); *Quintero*, 567 F. App'x. at 619. The regulations lay out several factors for the ALJ to consider in deciding the weight to give to each opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Quintero*, 567 F. App'x. at 620. "[T]o the extent there are differences of opinion among the medical sources, the ALJ must explain the basis for adopting one and rejecting another, with reference to the factors governing the evaluation of medical-source opinions set out in 20 C.F.R. §§ [404.1527(c)] and [416.927(c)]." *Reveteriano v. Astrue*, 490 F. App'x. 945, 947 (10th Cir. 2012) (unpublished). When the ALJ fails to properly evaluate medical source opinions, the case must be remanded. *Quintero*, 567 F. App'x. at 621.

    A.  Dr. LaCourt

The ALJ wove her discussion of Dr. LaCourt's opinion throughout her analysis. She stated that Dr. LaCourt found Hawthorne to have attention and concentration in the normal range (AR 18), though his assessment lists Hawthorne as having "marked limitation" with "sustained concentration/task persistence" (AR 287-88). The ALJ made no reference to Dr. LaCourt's assessment when discussing Hawthorne's social functioning. Dr. LaCourt found that Hawthorne experienced mild limitations when interacting with the public, but marked limitations when interacting with coworkers or supervisors. (*Id.*)

Dr. LaCourt diagnosed Hawthorne with "Major Depressive Disorder, recurrent, severe, without psychotic symptoms." (AR 288.) He noted that Hawthorne experienced several marked limitations, particularly with regard to sustained concentration and interacting with coworkers, as well as several mild limitations.

The ALJ stated that, while both consulting examiners (Dr. LaCourt and Dr. Simpson) noted some limitations in Hawthorne's overall daily functioning, she had accounted for those limitations in her RFC findings. Nowhere in the opinion does the ALJ explain the weight accorded to Dr. LaCourt's opinion or how that opinion was incorporated into the RFC findings. The ALJ failed to adequately assess the opinion of Dr. LaCourt by failing to explain the weight accorded or how it is accounted for in the RFC findings.

B.  Dr. Simpson

The ALJ similarly failed to adequately assess the opinion of Dr. Simpson. While the discussion of Dr. Simpson's opinion is also woven throughout the ALJ's analysis, the discussion suffers from the same lack of explanation for according weight and explaining how the opinion has been taken into consideration. The ALJ's discussion of Dr. Simpson's opinion also suffers from a conclusory statement of inconsistency and lack of resolution.

The ALJ stated that Dr. Simpson found Hawthorne to have no difficulty concentrating. While his description of his conversation with Hawthorne indicated that Hawthorne was present and aware during the examination, his assessment of her clinical condition stated that Hawthorne experienced "Moderate – Marked Limitation" in her ability to concentrate and attend or to carry out instructions.

The ALJ found Dr. Simpson's assessment to be internally inconsistent based on the fact that he "noted only mild limitations in [Hawthorne's] ability to understand, remember and carry

out very short and simple instructions" and his finding that Hawthorne may "have some difficulty maintaining employment." Dr. Simpson's prognosis was that Hawthorne's condition, moderate and recurrent major depressive disorder with a GAF of 50, was not likely to change over the next year. He noted mild limitations with short and simple instructions, but moderate limitations with more complicated instructions. Dr. Simpson noted moderate limitations in Hawthorne's ability to use public transportation, specifically noting "no buses." He indicated moderate-to-marked limitations in her sustained concentration and task persistence, and mild-to-moderate limitations in her social interactions.

The ALJ fails to explain where she finds the inconsistency or how she accounted for Dr. Simpson's opinion in the RFC findings. As with Dr. LaCourt, the ALJ failed to adequately assess the medical opinion of consulting examiner Dr. Simpson.

C.  Dr. Gucker

Dr. Gucker, a state agency medical consultant, also assessed Hawthorne with moderate and recurrent major depressive disorder, after reviewing her file. Dr. Gucker did not have personal interactions with Hawthorne and did not perform an examination. The ALJ granted "significant weight" to Dr. Gucker's nonexamining opinion because it is "more consistent with the medical records and the claimant's overall daily functioning." The ALJ did not, however, elaborate on Dr. Gucker's opinion or provide specific reasons for resolving any conflicts between Dr. Gucker's opinion and the opinions of Dr. Simpson and Dr. LaCourt.

## CONCLUSION

The ALJ erred in her review of Hawthorne's applications by failing to fully address the opinions of the consulting examiners, Dr. LaCourt and Dr. Simpson, and failing to explain the reasons for accepting and rejecting portions of each opinion. Furthermore, the ALJ erred by failing to explain why she gave "significant weight" to the opinion of a non-examining consultant, particularly when that opinion contradicted the opinions of both consulting examiners. Therefore, I grant Hawthorne's motion to reverse, and I remand this case back to the SSA to reconsider the medical opinion evidence and other proceedings consistent with this opinion.

IT IS SO ORDERED.

*William P. Lynch*
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.